# HAWAIIAN CARRIAGE MANUFACTURING COMPANY, LIMITED, A HAWAIIAN CORPORATION, *v.* SCHUMAN CARRIAGE COMPANY, LIMITED, A HAWAIIAN CORPORATION.

### APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED MAY 1, 1906.                    DECIDED MAY 21, 1906.

### FREAR, C.J., HARTWELL AND WILDER, JJ.

AGREEMENT IN RESTRAINT OF TRADE—*whether illegal by Sherman Act of July* 2, 1890, *if good at common law.*

The plaintiff and the defendant agreed upon the purchase of the stock in trade of another company under an option obtained by the plaintiff, certain of the stock, including vehicles, being taken by the defendant and the rest, including rubber tires, by the plaintiff; the defendant was to turn over to the plaintiff for five years its trade in certain of the articles bought, not including vehicles, and be allowed as commissions one-half of the profits on rubber tires which it was not to sell at prices less than those set by the plaintiff, while the plaintiff was not to sell during the five years new imported vehicles. Held: The agreement was good at common law, its main object being not to restrain the trade or prevent the competition of either party and it was not illegal under the provisions of the Anti Trust Act of July 2, 1890, applicable to Territories.

ID.—*corporations—pleading—jurisdiction in equity for accounting.*

The agreement, not being void or illegal, was not ultra vires and was not an abrogation of corporate functions. Although averments of agency, partnership or fiduciary relations between the parties, averred in the bill, are not shown by the agreement and the bill does not sufficiently aver mutual accounts a case for accounting is shown. Sec. 1834, R. L.

### OPINION OF THE COURT BY HARTWELL, J.

This is an appeal by the plaintiff from a decree sustaining the defendant's demurrer to the plaintiff's bill and dismissing the bill.

The parties had agreed with each other (1) that if the plaintiff should purchase from the Pacific Vehicle and Supply Company, Ltd., of Honolulu, its stock of merchandise or a portion thereof the defendant was to buy from the plaintiff "all the vehicles, harness and saddlery goods, lamps, whips, robes, blankets and accessories" that the plaintiff might acquire from the Pacific Co., paying the plaintiff such sums of money as it might have agreed upon with the Pacific Co., and (2) its (the defendant's) proportion of the expense of inventorying and transferring the stock and such other expense as might be incurred by the plaintiff "in effecting such sale, inventory, transfer," etc.; and (3) agreeing to give to the plaintiff "all of his trade in rubber tires, carriage hardware, trimmings and materials, paints, varnishes, etc., and to continue to turn over such business for the term of five years;" and (4) "not to sell rubber tires at a price lower than set" by plaintiff; (5) the plaintiff agreeing to "allow" the defendant "a commission equal to one-half its profits on all rubber tires purchased by or through" the defendant, "such commissions to be due on settlement of the account;" and not to sell in Hawaii "new imported vehicles during the term of five years."

The bill avers that at the date of the agreement, March 20, 1903, the plaintiff had an option for the purchase of the Pacific Co.'s stock, a portion of which the defendant desired to purchase and made an offer to the plaintiff that if it would buy the whole of the stock or a portion thereof and sell to the defendant its trade and business in new imported vehicles and good will therein the defendant would buy from the plaintiff the vehicles, etc., and sell to the plaintiff the defendant's trade and business in rubber tires, carriage hardware, trimmings and material, paints and varnishes "and things pertaining to the carriage manufacturing and repair business, and defendant's good will in said trade and business;" that the plaintiff thereupon purchased the stock of the Pacific, etc., Co. at an expenditure of $9,915.43 "above the value of that portion of said stock which defendant agreed to take," doing this in reliance upon the defendant's promise to give the plaintiff its trade in rubber

tires "for which there had become at said time a greatly
increased demand;" that the plaintiff entered into the agree-
ment in consideration of the defendant's sale to the plaintiff
for five years of defendant's trade and business in Hawaii in
rubber tires, carriage hardware, trimmings and materials,
paints, varnishes, etc., together with defendant's good will in
the trade and business, and that the plaintiff "for other good
and valuable consideration, as hereinabove set forth, sold to
defendant for said term of five years plaintiff's trade and busi-
ness within the Territory of Hawaii in new imported vehicles,
together with its good will in said trade and business."

"That as ancillary to said agreement, to protect the respect-
ive rights of the parties thereunder, and to save to said parties
the respective rights for which they had bargained as aforesaid,
it was mutually agreed that neither party should for said term
engage in the trade and business which it had respectively sold
to the other, and that each should turn over to the other all
its trade in said articles and things the good will wherein was
sold by the respective parties as aforesaid.

"That by said agreement it was stipulated that although
defendant was not to deal in rubber tires independently and
on its own account, yet defendant was authorized to sell rubber
tires as the agent of plaintiff, and was to receive as plaintiff's
agent in compensation for such sales, a commission equal to
one-half of the profits thereon; and further that in all such
sales of rubber tires plaintiff was to fix the minimum price."

That the defendant paid $5,000 for the portion of the stock
which it took and also its share of the expense of inventorying,
etc., but otherwise has not performed its agreement and has
carried on an extensive trade in rubber tires and neglected and
refused to account to the plaintiff for sales thereof or to turn
over to the plaintiff its share of the profits from the sales
thereof and, in further disregard of its agreement, has dealt
in carriage hardware, trimmings and materials, paints and
varnishes and other things pertaining to the carriage manufac-
turing and repair business and refused to perform the agree-
ment "in respect of the good will and trade" therein and "to
account to plaintiff in respect to said matters;" that in conse-
quence of the defendant's default the plaintiff has on hand a

large amount of the goods and material purchased by it of the Pacific, etc., Co., which it is unable to dispose of but would have disposed, of had the defendant turned over its trade to the plaintiff; that in further violation of the terms and spirit of the agreement the defendant has bought out the carriage repair and manufacturing and rubber tire fitting business of the Murray Carriage Company in Honolulu and is carrying on the business on its own account to the plaintiff's damage; that the defendant has become liable thereby to the plaintiff for large sums of money for which it ought to account to the plaintiff, the amounts of which cannot be determined without an accounting and discovery, but which the plaintiff avers on its information and belief to amount to $200 a month since the date of the agreement, and that by reason of the defendant's default the plaintiff has been damaged in said amounts, as well as for loss of trade and business in the further amount, averred on information and belief, of $5,000.

The bill avers that the plaintiff has complied with its under-ever been and is now ready to account to the defendant "for commissions earned by defendant on account of sales of rubber tires made by or through defendant as plaintiff's agent."

The bill prays for an accounting and an injunction restraining the defendant from breach of the agreement made by it.

The grounds of the demurrer are (1) that the agreement is void because it "unreasonably tends to restrain trade in an article of commerce," and also because it is prohibited by the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies;" (2) that the averment in the bill of the defendant's agency is a conclusion of the pleader from the agreement which does not warrant the conclusion; (3) that the terms of the agreement do not warrant the averment in the bill that the parties sold to each other their respective good wills; (4) that the bill is "nonsensical, absurd and frivolous," more particularly with reference to its averment that "defendant is indebted to complainant at least in the amounts that such accounting can determine;" (5) that the bill is insufficient and uncertain in

its non-averment that the defendant ever received from the plaintiff for its account, for sale or otherwise, any rubber tires or other goods or how the dealings between the parties involve "the matters and things which form the subjects of said agreement" or how they differ from ordinary mutual accounts between merchants; (6) that the bill is without equity (7) plaintiff having a plain, speedy and adequate remedy at law; and (8) "is inflated with redundant, immaterial, impertinent and frivolous allegations and conclusions of law and fact, wholly unwarranted, inserted in said amended bill for the purpose of stating a case within the cognizance of this honorable court of chancery;" and (9) that it does not appear from the bill that the agreement was entered into by the parties or was obligatory on the part of the defendant corporation.

The object of the parties, as far as the agreement shows, was (1) to acquire the stock in trade of another company, averred in the bill to have been "carrying on its business at a loss and desirous of disposing of the same," availing themselves of the plaintiff's option to purchase the stock, the defendant taking all the vehicles, harness and saddlery goods, lamps, whips, robes, blankets and accessories, and the plaintiff taking the rest of the stock; and (2) to dispose of the stock so acquired and apportioned between them in a way which they deemed to be mutually advantageous, namely, by the plaintiff agreeing not to sell in Hawaii new imported vehicles for five years and the defendant agreeing to give the plaintiff its trade in rubber tires, carriage hardware, trimmings and materials, paints, varnishes, etc., and continue to turn over its business for five years but retaining half the profits on rubber tires and agreeing not to sell them for less than the plaintiff's prices. Neither party sold its good will to the other and it is evident that the defendant was to continue its trade and business and not retire from it and that the plaintiff continue its business, with the exception of imported vehicles.

As pointed out by the defendant, the bill fails to aver that the defendant bought of the plaintiff the portion of the stock, including vehicles which it "took over." We infer that there

was no transfer from the plaintiff to the defendant and no payment of the "$5,000 worth" made directly to the plaintiff, but that the stock was sold to them separately, the defendant taking those articles which it had agreed with the plaintiff to take and paying the seller therefor the prices agreed upon between the plaintiff and the seller. The defendant thus got the benefit of the prices at which the plaintiff had secured an option. Taking the agreement, then, to have for its ultimate object an advantageous disposition of the purchased stock, and that in order to make the agreement effective it was applied not only to the new purchase but to all their stock in trade whether previously held or afterwards acquired during the agreed term of five years, the question to consider is whether, if the agreement was such as lawfully could be made by these parties under the law of corporations, it was good at common law.

Each of the parties expected to gain by the agreement, by which not only the defendant got the benefit of the option but the plaintiff also was able to take, at the prices agreed upon for the whole stock, those things which the defendant did not take. The defendant, of course, thought that it would sell enough more vehicles and at enough higher rates, if the plaintiff kept out of the carriage business for five years, to more than counterbalance its profits upon the trade in the other specified things, retaining half the rubber tire profits; while the plaintiff thought that the defendant's trade in those things added to one-half the rubber tire profits would more than make good its profits on trading in vehicles for that period of time and that it could well afford to divide rubber tire profits equally seeing that the defendant would not undersell it. The defendant did not restrain itself or the public from trading by giving the profits of its trade to the plaintiff or by conforming to the plaintiff's prices on rubber tires. Whether competition in prices is for the advantage either of buyers or sellers in the long run depends upon many indeterminate and variable conditions. The kind of competition which ruins and drives out of business leaves buyers worse off than ever and accomplishes the greatest restraint upon trade which is practicable, while no rule of com-

mon law requires traders to compete with each other or precludes their agreeing not to compete under some circumstances or conditions.

Was then the plaintiff's promise that it would not sell imported vehicles in Hawaii for five years a legal consideration for the defendant's undertaking or was it opposed to public policy so that the resulting agreement was void? A trader may sell or agree to sell out all his business and stock in trade and as part of the consideration, for which he received value, may, under such limitations of time and space as are deemed to be "reasonable," agree with the buyer not to carry on business in the things sold. Similar restrictions upon trade may be agreed upon by a retiring partner not to compete with the firm; by an employee not to compete with the employer after leaving the employment. "It by no means follows, however, that an agreement in partial restraint of trade must fall within one of these descriptions in order to be valid." Pollock's Principles of Contract, 313.

"The admission of limited restraints is commonly spoken of as an exception to the general policy of the law. But it seems better to regard it rather as another branch of it. Public policy requires on the one hand that a man shall not by contract deprive himself or the state of his labor, skill or talent; and on the other hand, that he shall be able to preclude himself from competing with particular persons so far as necessary to obtain the best price for his business or knowledge, when he chooses to sell it. Restriction which is reasonable for the protection of the parties in such a case is allowed by the very same policy that forbids restrictions generally, and for the like reasons." Ib. 310, citing *Leather Cloth Co. v. Lorsont,* 9 Eq. 353.

The public is not concerned to know whether transactions of this kind are detrimental to those who participate in them or not and properly leaves parties to act according to their own view of what is advantageous to themselves as long as they do or agree to do nothing which contravenes statutory law.

The question recurs whether the plaintiff's agreement is within the reason of the above mentioned classes of agreements,

as required by the promisee for the protection of some right which the promisor has conceded to him, and goes no further than reasonably is required for its protection. It is with reference to this latter condition that the expression "partial or reasonable restraint of trade" is ordinarily used. The plaintiff was to sell no vehicles to interfere with the defendant selling for five years. The plaintiff's promise was in consideration of the defendant's buying the vehicles and other things specified which it agreed to take and which the plaintiff either did not wish or was unable to buy although it wished the benefit of the option prices for the rest of the stock. If the plaintiff had bought the vehicles of the vehicle company and sold them to the defendant its agreement not to deal in them in Hawaii for five years would have been the ordinary agreement between buyer and seller which the law recognizes. The agreement does not appear to have had for its primary object the acquiring control of the vehicle trade to the extent of removing the plaintiff's competition but rather the protection of the defendant's interest in selling the vehicles acquired through the plaintiff, and, to a certain extent, for its benefit. The agreement is not void on the ground that it was opposed to public policy. The plaintiff's agreement not to sell imported vehicles in Hawaii for five years did not unreasonably secure the defendant against its competition in selling vehicles bought under the terms of the agreement. The clauses of the agreement are interdependent, each being part of the general scheme, each party making its several promises in reliance upon each and all the promises of the other party.

Mr. Justice Holmes, in his dissenting opinion in the *Merger* case, said: "Contracts in restraint of trade are dealt with and defined by the common law. They are contracts with a stranger to the contractor's business, (although in some cases carrying on a similar one,) which wholly or partially restrict the freedom of the contractor in carrying on that business as otherwise he would. The objection of the common law to them was primarily on the contractor's own account. The notion of monopoly did not come in unless the contract covered the whole of England.

*Mitchel v. Reynolds,* 1 P. Wms. 181.  Of course this objection did not apply to partnerships or other forms, if there were any, of substituting a community of interest where there had been competition.  There was no objection to such combinations merely as in restraint of trade, or otherwise unless they amounted to a monopoly.  Contracts in restraint of trade, I repeat, were contracts with strangers to the contractor's business, and the trade restrained was the contractor's own.

"Combinations or conspiracies in restraint of trade, on the other hand, were combinations to keep strangers to the agreement out of the business.  The objection to them was not an objection to their effect upon the parties making the contract, the members of the combination or firm, but an objection to their intended effect upon strangers to the firm and their supposed consequent effect upon the public at large.  In other words, they were regarded as contrary to public policy because they monopolized or attempted to monopolize some portion of the trade or commerce of the realm.  See *United States v. E. C. Knight Co.,* 156 U. S. 1."  *Northwestern Securities Co. v. U. S.,* 193 U. S. 404.

This agreement was not made with a stranger, nor did it seek to keep strangers out of the business.

In reference to agreements limiting competition which accompany business transactions and are good at common law Mr. Justice Brewer, while holding that the *Merger* case was within the Sherman Act, said:  "Congress did not intend to reach and destroy those minor contracts in partial restraint of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld."  Ib., 361.

In a recent case, decided January 2, 1906, the U. S. Supreme Court upheld a contract by which one party sold to the other certain steamers and other property to be paid for in annual instalments in five years, with a condition that if opposition to the buyer's boats running between certain points should cause low rates, payment of instalments should be postponed until the opposition ceased and that if it continued two years without interruption without annual payment the first party

could cancel the agreement; and further, "as a part of the consideration of this agreement," it was agreed that for five years the seller should not engage or be interested in any freight and passenger business between the points mentioned except the towing and barge business as long as it did not interfere with the other party's freight and passenger business; further, it was agreed that the buyer would maintain the rates charged by the seller on business above a point named, not, however, exceeding railroad rates. This last clause in the agreement was "especially relied upon as making the contract illegal as in restraint of trade," while the suspension of instalments in case of opposition rising to a certain height was "referred to as a combination to aid the purchaser in getting a monopoly of river trade" between the specified points. Of this latter agreement the court said that it was "security against a losing bargain, not a combination to gain a monopoly. The withdrawal of the vendors from opposition for five years is the ordinary incident of the sale of a business and good will. * * * It would accomplish no public purpose, but simply would provide a loophole of escape to persons inclined to elude performance of their undertakings, if the sale of a business and temporary withdrawal of the seller, necessary in order to give the sale effect, were to be declared illegal in every case where a nice scrutiny could discover that the covenant possibly might reach beyond the state line. We are of opinion that the agreement before us is not made illegal by either of the provisions thus far discussed." *Cincinnati, etc., Packet Co. v. Bay, et alt.,* 26 U. S. S. C. Rep. 208.

It is but fair to the defendant's attorneys to say that they do not contest the law which is applicable to the construction which we place upon the agreement, their contention, which we do not sustain, being that its object was to absorb the trade of a rival concern for the purpose of avoiding its competition and to restrict their own trade for the purpose of avoiding mutual competition.

But the defendant insists that whether at common law the agreement was good or bad, reasonable or not, and whatever

its motive or object, it was an agreement which undoubtedly restrained trade and therefore is within the implied prohibition of the Sherman Act which declares all contracts and combinations in restraint of trade to be illegal.

The act does not make it a misdemeanor to "monopolize or attempt to monopolize or conspire with any other person or persons to monopolize any part of the trade or commerce" of a Territory.   Section 2 of the act makes this a misdemeanor only when directed to trade or commerce among the States or with foreign nations.   The thing which is made illegal by section 1 in respect "of trade or commerce among the several states or with foreign nations" is, by section 3, illegal in respect of the trade or commerce in any Territory, the section reading as follows:

"Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, is hereby declared illegal.   Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

With the exception of the cases pending in the federal court in Hawaii we are aware of none which have been brought under this section.   The act, in section 3, deals with contracts in restraint of interstate or territorial trade and commerce and, in section 2, with monopolizing or attempts, combinations or conspiracies to monopolize interstate but not territorial trade and commerce.   The case, therefore, if treated as an attempt or conspiracy to monopolize trade in Hawaii, would contravene no provision in the act.   There being no power vested in Congress to declare a contract in restraint of state trade or commerce illegal or a misdemeanor, section 1 appropriately con-

fines the illegality and criminality therein declared to contracts in restraint of interstate trade and commerce which, unless the United States Supreme Court decisions hold otherwise, we should regard as including only contracts illegal at common law, the act thus accomplishing the object of bringing such illegal contracts under federal jurisdiction.

The defendant bases its claim that the agreement is in restraint of trade on the grounds (1) that it "restrains the corporations from carrying on business which they were each created to carry on;" (2) that "it eliminates competition between themselves," and (3) that "it tends to monopoly" and "enables one corporation to fix the minimum price for the sale of the other corporation's goods" and "deprives one corporation in trade of its full and natural powers in respect to its business of trade and commerce."

We do not recognize the tendency of the agreement to monopolize trade and, as above stated, the act does not concern itself with monopoly in territorial trade; to say that because it restricts the trade of the parties, eliminates their competiton with each other, keeps one of them from charging less than the other charges for tires, it therefore is illegal by the Sherman Act although not at common law, is simply asserting that the act makes an otherwise legal contract illegal, which is the question we have to consider.

The United States Supreme Court has repeatedly declared that the act includes legal as well as illegal contracts in restraint of interstate trade or commerce.

In *U. S. v. Trans-Missouri Freight.Assn.,* 166 U. S. 290, Mr. Justice Peckham, writing the opinion of the court, says: "We see no escape from the conclusion that if any agreement of such a nature does restrain it the agreement is condemned by this act," and that "so far as the very terms of the statute go they apply to any contract of the nature described;" that the "unlawful restraints" named in the title "include those restraints and monopolies which are made unlawful in the body of the statute," and that the act "is not limited to that kind of contract alone which is in unreasonable restraint of trade but.

all contracts are included in such language, and no exception or limitation can be added without placing in the act that which has been omitted by Congress." The same case, however, appears to make the exception of "A contract which is the mere accompaniment of the sale of property, and thus entered into for the purpose of enhancing the price at which the vendor sells it, which in effect is collateral to such sale, and where the main purpose of the whole contract is accomplished by such sale." Ib. 329. The minority opinion by Mr. Justice White, Justices Field, Gray and Shiras concurring, after remarking, "It is conceded that the contract does not unreasonably restrain trade, and that if it does not so unreasonably restrain, it is valid under the general law," (p. 344,) and that "from the reason of things, arose the distinction that where contracts operated only a partial restraint of the freedom of contract they were not in contemplation of law contracts in restraint of trade," continued, "To define then the words 'in restraint of trade' as expressing every contract which in any degree produced that effect would be violative of reason because it would include all those contracts which are the very essence of trade and would be equivalent to saying that there should be no trade and therefore nothing to restrain." (p. 351.)

That case was an agreement between eighteen railroad companies who formed an association and agreed with each other upon the appointment of a committee to establish and regulate traffic rates, fares and charges which the bill charged as an unlawful combination and conspiracy for monopolizing and restraining interstate trade and commerce. Notwithstanding the remark in the minority opinion that it was conceded that this contract did not unreasonably restrain trade, the court, in the majority opinion, says: "The general reasons for holding agreements of this nature to be invalid at common law, on the part of railroad companies, are quite strong if not entirely conclusive." (p. 335.)

The case presented in *U. S. v. Joint Traffic Assn.,* 171 U. S. 505, in which thirty-one railway companies formed an asso-

ciation to have jurisdiction over competitive traffic rates, fares and charges, was held to be substantially the same as the *Trans-Missouri Freight case*. Mr. Justice Peckham, writing the opinion of the court, (Justices Gray, Shiras and White dissenting and McKenna taking no part in the decision,) says of the former case, "There was no admission or concession in that case that the agreement did in fact restrain trade to a reasonable degree" (p. 560); that the opinion of the court in that case "shows that the issue so made (as to the character of the agreement, whether it was or was not one in restraint of trade) was not ignored, nor was it assumed as a concession that the agreement did restrain trade to a reasonable extent. * * * To suppose, as is assumed by counsel, that the effect of the decision in the *Trans-Missouri case* is to render illegal most business contracts or combinations, however indispensable and necessary they may be, because, as they assert, they all restrain trade in some remote and indirect degree, is to make the most violent assumption and one not called for or justified by the decision mentioned, or by any other decision of this court." (p. 568.)

In *Addyston Pipe & Steel Co. v. U. S.*, 175 U. S. 211, there were six defendants, one being a company in Ohio, one in Kentucky, two in Alabama and two in Tennessee, which had agreed together upon no competition in the manufacture and sale of cast iron pipe in any of the thirty-six states or territories mentioned in the agreement, the sole object of the agreement being to advance prices and prevent any competition. The court said that "The agreement or combination was not one which simply secured for its members fair and reasonable prices for the article dealt in by them" (p. 235), but that the facts "show conclusively that the effect of the combination was to enhance prices beyond a sum which was reasonable." (p. 238.)

*Montague & Co. v. Lowry*, 193 U. S. 38, was an agreement between the manufacturers of and dealers in tiles, mantels and grates, the dealers agreeing not to buy from manufacturers who were not members of the association and not to sell unset tiles to others for less than certain prices which were fifty per cent. higher than the prices to members; the manufacturers residing

out of California agreeing not to sell to any but members. This was an agreement which restrained trade by narrowing the market for the sale of tiles in California from manufacturers and dealers in other states "so that they could only be sold to the members of the association and at enhanced prices to the non-member." "The agreement directly affected and restrained interstate commerce," and, we should say, unreasonably so.

In the *Merger case,* Mr. Justice Brewer, referring to the foregoing cases, says, "I think that in some respects the reasons given for the judgments cannot be sustained. Instead of holding that the Anti Trust Act included all contracts, reasonable or unreasonable, in restraint of interstate trade, the ruling should have been that the contracts there presented were unreasonable restraints of interstate trade, and as such within the scope of the act."

Mr. Justice Holmes, writing the minority opinion, in which Chief Justice Fuller and Justices White and Peckham concurred, held that the case did not show an illegal combination in restraint of trade. He says that the ground of the decision in the *Traffic case,* which followed and affirmed the *Freight case,* was the showing of a "restriction by contract with a stranger to the contractor's business," this being his definition of an agreement void at common law. Clearly, it is because he thinks that those cases showed illegal contracts that he says, "I accept those decisions absolutely, not only as binding upon me, but as decisions which I have no desire to criticise or abridge. But the provision has not been decided, and, it seems to me, could not be decided without perversion of plain language, to apply to an arrangement by which competition is ended through community of interest—an arrangement which leaves the parties without external restrictions. That provision, taken alone, does not require that all existing competitions shall be maintained. It does not look primarily, if at all, to competition. It simply requires that a party's freedom in trade between the States shall not be cut down by contract with a stranger." (pp. 405, 406.)

The *Refineries case* (*U. S. v. Knight,* 156 U. S. 1,) and the *Beef Trust case* (*Swift & Co. v. U. S.,* 196 U. S. 375,) clearly

showed illegal agreements to monopolize trade although held in the former case not to relate to interstate trade.

It is at least doubtful whether the agreements in any of the cases cited except the *Packet Co. case,* supra, were good by general law. In that case, however, the parties had agreed that the seller should cease doing business between certain points for a limited time in order not to compete with similar business by the other party, the buyer agreeing to maintain the same rates as those charged by the seller not exceeding railroad rates. The case is conclusive upon the validity of the present agreement whether at common law or under the act. We consider the agreement to be valid by general law and that under the foregoing decisions it does not contravene any provision of the Sherman Act but belongs to the class of agreements which, as the decisions declare, are not intended by the act.

This ruling disposes adversely of the defendant's contention that the agreement was ultra vires because illegal on any of the grounds mentioned. As to the defendant's claim that neither party could abrogate its corporate functions or permit their control by the other, we do not think that this would be the result of the acts agreed upon. A corporation in its own interests may agree with another for the performance of corporate acts which its charter authorizes it to do itself. For instance, a sugar corporation having by charter the right to do land and water transportation may profitably engage others to perform that service and agree not to do it itself for a specified time; and so of its cane cultivation or milling work.

It is the exercise of discretionary powers which by the corporate "charter, general laws, by-laws, vote of the stockholders or usage is vested in themselves" that directors of a corporation cannot delegate to others; nor can they delegate the "entire supervision and control of the corporation." Cl. & Mar., Private Corporations, 2232, and cases there cited. The rule that corporations, unless authorized by statute, cannot form a copartnership or enter into business relations involving partnership liabilities does not affect the agreement between these parties whereby for good and sufficient considerations one of them to

a certain extent limits its trade and one agrees not to undersell the other in an article of the merchandise which was bought under a mutual arrangement.

The defendant, in support of its ground of demurrer that the bill is uncertain, claims that it is not sufficient to aver, as the bill does, the making of the agreement by the parties but that the authority by resolution of the stockholders ought also to be averred. We think the averment is sufficient in view of our finding that the agreement was not ultra vires or illegal.

In passing upon the grounds of demurrer that the case is "without equity" and that the plaintiff's remedy is at law, we are unable to take the plaintiff's version of all the matters averred in the bill. For instance, we find no averment of fact on which the relation of principal and agent or any fiduciary relation between the parties is based or that since the purchase of stock either party has done anything under the agreement unless by their "dealings" together in rubber tires. The bill avers that since the agreement the parties have "had a great . number, and almost daily, dealings with each other, and have had and now have running accounts with each other for labor, services, materials and goods, which accounts involve * * * the matters and things which form the subjects of said agreement, and include among other things, mutual dealings in rubber tires."

The existence of mutual accounts in respect of matters not within the agreement is immaterial to the case. If the averment means that in respect of the rubber tires "purchased by or through" the defendant from the Vehicle Co., or elsewhere, it paid the plaintiff part but not all of its profits, there would be no mutual account in them, and we do not infer this to be the meaning of the pleader. The same would be true if he meant that the defendant had bought some tires and failed to pay for them. "The precise legal definition of the words 'mutual dealings' does not seem to have been settled." *Receivers vs. Patterson Gaslight Co.,* 23 N. J. L. 304.

We do not infer from any averment in the bill that the defendant has paid money to the plaintiff with the request that

it be credited to it for account of its business profits or has
authorized the plaintiff to charge itself in that account with
money owing by it to the defendant. One party cannot make
a mutual account. "Where payments on account are made by
one party for which credit is given by the other it is an account
without reciprocity and only upon one side." *Warren v.
Sweeney,* 4 Nev. 101. We take the case as presented by the
bill to be that the defendant "has wholly neglected to perform
said agreement in respect to the good will and trade in said
articles last mentioned and has neglected and refused to account
to plaintiff in respect to said matters though often requested by
plaintiff so to do." If equity has jurisdiction in this case it is
not by reason of any fiduciary relation between the parties but
must be based upon the agreement of the defendant to turn over
its trade to the plaintiff accepting half its profits on rubber tires
as a commission for selling them, the "commissions to be due on
settlement of the account," implying that the defendant will
account therefor to the plaintiff; and upon the relations estab-
lished between the parties which, although falling short of
making the defendant a partner, agent or trustee of the plaintiff
in the ordinary sense of the term, resemble a joint venture for
the purchase and disposal of a new stock of goods by a scheme
which has some features which exist in partnership cases.

In *Keelikolani v. Robinson,* 2 Haw. 436, there was an agree-
ment in which the half of a wharf in Honolulu was made over
to the defendant on condition that he pay one-half of the
expense of altering and repairing the same and of all the moneys
received for its use; the court, citing *Ewing v. Janion,* 1 Haw.
66, considered that in respect of the accounting "the case comes
fully within the powers of a court of equity." In matters of
accounting cognizable at law, the general rule is stated to be
"that a proper case is presented when the remedies at law are
inadequate." 3 Pom., Eq. Jur., Sec. 1420. A suit may be had
in equity for an accounting "where the accounts are all on one
side and there are circumstances of great complication or diffi-
culties in the way of adequate relief at law." Ib. Sec. 1421
and cases cited in note. It rests largely in the discretion of

the court to say whether an accounting is complicated. In *Hawaiian Government v. Brown,* 6 Haw. 750, the accounts were not, found to be mutual or complicated. "They are lengthy, it is true, but they could be submitted to a jury and the results reached by them without difficulty." (p. 752.)

In the case before us it would be necessary to ascertain the defendant's profits during the period of three years by a judicial examination and verification of its books and the charges and credits shown by them, requiring rulings upon their propriety or lawfulness,—which would be inconvenient to do in a jury trial. A judge can accept the report of a competent accountant if no error is pointed out, while a jury might require that every item be proved to its satisfaction by original evidence involving difficulties and delays in reaching a final adjustment. A discovery in such cases would facilitate the accounting. The case, we think, comes within the statute giving equity jurisdiction of "Suits upon accounts when the nature of the account is such that it cannot be conveniently and properly adjusted and settled in an action at law." Sec. 1834, R. L.

In the view we take of the case it is unnecessary to discuss the defendant's citations on the subject of jurisdiction although they have received full consideration, having evidently been selected with care. The accounting will be confined to the transactions mentioned in the agreement.

The second, third and fifth grounds of demurrer, which relate to averments not supported by the agreement and to vagueness and insufficiency of other averments, would properly have been sustained at the hearing of the bill with leave to amend, and such averments can be ignored in the answer; but as the bill is good for an accounting the demurrer is overruled and the decree appealed from is reversed with leave to answer over in ten days.

*C. F. Clemons* (*Thompson & Clemons* on the brief) for plaintiff.

*S. B. Kingsbury* and *A. S. Humphreys* for defendant.