# THE UNITED STATES OF AMERICA *vs.* METROPOLITAN MEAT COMPANY, LIMITED, an Hawaiian Corporation, *et als.*

## October 2, 1906.

*Competition in trade and commerce:* Competition is essential to trade and commerce from the point of view and in the interest of the public.

*Combination to destroy competition:* Combinations to destroy competition are within the act of July 2, 1890 (26 Stat. L. 209), known as the anti-trust act, as combinations in restraint of trade or commerce.

*Restraints of trade and monopolies:* While all restraints of trade are not monopolies, all commercial monopolies are probably restraints of trade. A combination to effect a monopoly in a Territory is therefore a combination in restraint of trade, and is within the third section of the anti-trust act.

*Practice—Bill for enforcement of anti-trust act:*    It is sufficient if a bill for the enforcement of the anti-trust act shows that a combination in direct restraint of trade or commerce, with sufficient power for the accomplishment of that object, has been entered into, without showing that any means have been taken to carry out such object.

*Combination in restraint of trade—Injunction:*    A combination of nearly all of the graziers and wholesale dealers in beef cattle and fresh beef in the Territory of Hawaii and a corporation engaged in the wholesale and retail trade in beef cattle and fresh beef in such Territory, whereby the former agree not to engage in such retail trade as competitors of the latter, not to deal in beef cattle or fresh beef with any competitor of the latter and to prevent and discourage importations of beef cattle and fresh beef by outsiders in favor of competitors of any member of the combination, and whereby such corporation agrees to purchase its entire demands for beef cattle and fresh beef from the former in equal portions at an agreed price, which should be the same for each of them and should not be changed by the supply or demand of beef cattle and fresh beef in the localities supplied by it, not to produce, deal in or import such commodity other than it purchased from the former and would prevent and discourage importations thereof by outsiders, in order to control prices of beef cattle and fresh beef to dealers and consumers in the Territory and to destroy competition among themselves and monopolize the trade in beef cattle and fresh beef in the Territory, is an illegal combination within the meaning of the anti-trust act and may be restrained and enjoined in an action by the United States.

*Unlawful combination—Acts to effectuate:*    Not necessary to a case under the anti-trust act that the acts alleged to have been done or agreed to be done to carry out the unlawful combination, shall in themselves be unlawful.

*·Agreement—Mutuality:*    Where an agreement intrinsically shows mutuality between parties to it, it is sufficient without an express statement of such mutuality.

*Combination in restraint of trade—Construction:*    The words of the statute "in restraint of trade," cover both the meaning of the words *for restraint of trade* indicating intention and the broader meaning of a scheme whose main result must be restraint of trade whatever its ostensible purpose.

*Reasonable restraint of trade:*    The words of the statute allow no exception on the ground of the reasonableness of a restraint and it is not limited to unreasonable restraints.    But a combination to effect some lawful purpose, but which remotely and incidentally restrains trade is not within the statute, the intent being absent.    A combination, however, whose main result must be direct restraint of trade, is within the act, whatever its ostensible purpose, for the parties thereto cannot be ignorant of such necessary and paramount effect.

*Practice—Allegations as to restraint of trade:*    Not necessary to show in proceedings under the anti-trust act that restraint of trade is actually effected or made complete by the combination complained of.

*In Equity*:  Demurrers to bill for an injunction.

*Holmes & Stanley, Ballou & Marx, Kinney, McClanahan & Cooper, Castle & Withington, C. F. Peterson, H. E. Highton,* and *J. S. Low,* (defendant, in person) for the demurrers.

*J. J. Dunne,* Ass't. U. S. District Attorney, for Plaintiff.

DOLE, J.  The bill charges an unlawful combination, trust and conspiracy between the defendants in restraint of the trade and commerce of the Territory of Hawaii in violation of an act of Congress of July 2nd, 1890, entitled "An act to protect trade and commerce against restraints and monopolies" (26 Stat. L., chap. 647, p. 209); and that certain agreements have been entered into between them and certain things done by them to carry out such combination, trust and conspiracy.

For convenience the Metropolitan Meat Company, Limited, will be referred to herein as the Metropolitan, the other defendants where they are classed together, as the other or remaining defendants and the Territory of Hawaii as the Territory.

After preliminary statements, the bill sets forth substantially as follows:

4.—The defendants have been and will be engaged in the Territory in the business of producing and dealing in beef cattle and fresh beef to dealers and consumers in the Territory, and in so doing have been, are and will be engaged in trade and commerce in the Territory.

5.—The city of Honolulu on the Island of Oahu in the Territory is the principal port of import and export of the Territory, and also the principal market and distributing center of the Territory for said defendants.  The Metropolitan has its principal place of business in said Honolulu, and has been, is and will be engaged in the business of selling and delivering beef cattle and fresh beef to dealers and consumers in the Territory, and particularly in said Honolulu, on behalf of the other defendants, and so far as the said Honolulu is concern-

ed, exclusively on behalf of said defendants, and in so doing the defendants have been, are and will be engaged in trade and commerce in the Territory.

6.—The Metropolitan is under the control and ownership of the remaining defendants, and more than seventy-five (75%) per cent of the capital stock therein is owned and controlled by them, and all of the officers and directors of the Metropolitan are elected and controlled by them.

7.—Such beef cattle and fresh beef are generally used for domestic purposes and as food by the people of the Territory, and fresh beef is one of the prime and common necessaries of life to them, and has been, is and will be an article of trade and commerce in the Territory.

8 and 9.—About 3,667,405 pounds weight of beef cattle produced in the Territory of the value of $347,178.25 in money of the United States, are consumed annually by such people, and about ninety (90%) per cent of such beef cattle has been, is now and will continue to be produced and dealt in by the defendants in the Territory as an object of trade and commerce therein.

10 and 11.—All of such beef cattle are produced in the Territory. The defendants comprise nearly all the wholesale dealers in the Territory, who produce and deal in beef cattle and fresh beef to consumers and dealers in the Territory, and if combined together they can and do control the prices charged for fresh beef produced in the Territory.

12.—In such trade the defendants should, and, but for the acts herein complained of, would be in free and unrestrained competition with each other.

The bill thereupon charges substantially as follows:

13.—The defendants have been, are now and intend to continue to be engaged in an unlawful combination, trust and conspiracy in violation of the act referred to above to arbitrarily raise and lower prices and maintain arbitrary and oppressive prices at which they will sell directly or through their respective agents, beef cattle and fresh beef to dealers and consumers

8—D

in the Territory in order to restrain and destroy competition among themselves, which would otherwise exist, as to producing and dealing in beef cattle and fresh beef in the Territory, and to monopolize the trade and commerce in such beef cattle and fresh beef in the Territory, and in pursuance thereof have arbitrarily raised, lowered and maintained and will continue to arbitrarily raise, lower and maintain the prices at which they will sell beef cattle and fresh beef either directly or through their respective agents to dealers and consumers in the Territory.

14.—In order to restrain and destroy such competition and to monopolize such trade and commerce, and to maintain such unlawful combination, trust and conspiracy, a certain agreement has been entered into between the Metropolitan and the remaining defendants, and each of them, whereby the latter have agreed not to engage in the retail trade in beef cattle and fresh beef in the Territory as competitors of the Metropolitan, nor produce, deal in or deliver beef cattle and fresh beef to or for any competitor of the Metropolitan, and to prevent and discourage by every possible means and manner within their power, all importations of beef cattle and fresh beef into the Territory by anyone else upon the mainland of the United States or any foreign country, for any competitor in the Territory of the defendants or any of them;

15.—and whereby the Metropolitan agreed with the remaining defendants and each of them to purchase its entire demands for beef cattle and fresh beef from the remaining defendants, at an agreed price which should be the same for each of them, and to apportion the quantities so purchased among them, and that it would not produce or deal in or import into the Territory any beef cattle or fresh beef other than such as it purchased or should purchase from such remaining defendants, and would prevent and discourage by every possible means and manner in its power all importations into the Territory of beef cattle or fresh beef by anyone else other than the remaining defendants, on the mainland of the United States, in the Territory,

or in foreign countries, to or for any competitor in the Territory of the defendants or any of them. And it was further agreed that the price so fixed to be paid to each of the remaining defendants should not be changed in any manner by the demand for fresh beef in the localities supplied by the Metropolitan, nor by the supply of beef cattle available for said localities, save by the consent of the remaining defendants. That the plaintiff is unable to say when such agreement was entered into, but charges that the same is still in existence and has been in existence for more than a year last past, and was entered into subsequent to the 2nd day of July, A. D. 1890.

16.—The defendants entered into such agreement with the intent to form a combination, trust and conspiracy in restraint of the trade and commerce of beef cattle and fresh beef in the Territory, and with the intent to monopolize and combine and conspire to monopolize such trade and commerce, contrary to said act.

17.—In pursuance of such unlawful agreement and of such unlawful combination, trust and conspiracy, the defendants have been and are now able and have in fact and will continue to be able arbitrarily from time to time to raise and lower and maintain oppressive prices at which they will sell directly or through their respective agents, beef cattle and fresh beef to dealers and consumers in the Territory,

18.—And in pursuance of such unlawful agreement and of such unlawful combination, trust and conspiracy, the defendants have been and are now able and have in fact and will continue arbitrarily from time to time to cause large quantities of beef cattle and fresh beef to be withheld from the trade and commerce therein in the Territory, and purpose to withhold and do and will continue to withhold them from said trade and commerce and from sale to dealers and consumers thereof in the Territory, for the purpose of creating a scarcity of beef cattle and fresh beef and thereby to cause an advance in the market price thereof, and to enable defendants to impose oppressive or unreasonable prices at which they will directly or

through their respective agents sell beef cattle and fresh beef in the Territory.

19.—In consequence of such unlawful agreement, combination, trust and conspiracy, defendants have acquired a complete monopoly over the importation, production and delivery of beef cattle and fresh beef in the Territory, and dealers and consumers thereof are compelled by reason thereof to purchase from the defendants, in consequence whereof:

20.—Many persons whose names are at present unknown to the plaintiff have suffered and will continue to suffer great and irreparable loss by reason of the arbitrary and oppressive prices at which beef cattle and fresh beef have been held by defendants, and which said persons have been compelled to pay defendants therefor, and in a number of cases persons engaged in industries requiring the use of large quantities of beef cattle and fresh beef have been compelled to sell their plants and appliances of business and retire therefrom with great financial loss.

21.—The cost of beef cattle and fresh beef produced within the Territory is about six cents a pound, and the cost of beef cattle and fresh beef imported from the mainland of the United States and other foreign countries does not exceed six cents a pound, but ever since the creation of such unlawful agreement, combination, trust and conspiracy the defendants, not satisfied with the ordinary market rates, have from time to time raised and fixed the prices of beef cattle and fresh beef, and now and for some time past the prices charged to dealers and consumers in the Territory are from twenty-five to fifty per cent greater than they were at and before the time when defendants entered into such unlawful agreement, combination, trust and conspiracy, and such increased prices have been arbitrarily raised and fixed by defendants for some time past, and will continue to be maintained and made possible by means of such unlawful agreement, combination, trust and conspiracy.

22.—Notwithstanding the said act of Congress, the defendants continue and will continue in such unlawful agreement,

combination, trust and conspiracy, and in restraint of trade and commerce in beef cattle and fresh beef aforesaid to the injury of the common and public good of the people of the Territory, and unless they are restrained and the said agreement, combination, trust and conspiracy declared null and void and contrary to law, the defendants will artificially restrain such trade and commerce and fix and enforce unreasonable and arbitrary prices and regulations as to the importation, production, sale, shipment and delivery of beef cattle and fresh beef in the Territory to the manifest injury of the people of the United States and in defiance of law.

Twenty-eight demurrers and twenty-five answers were filed to the bill. The grounds of demurrer may be summarized as follows:

1.—The court is without jurisdiction.

2.—The bill states no case for relief.

3.—The bill is uncertain in that it does not state what means have been taken to carry out the alleged unlawful combination, trust and conspiracy, or what if any acts have been done in pursuance thereof, or whether any acts have been done thereunder, or whether such acts, if done, are illegal or in violation of the act of Congress referred to.

4.—The allegations of intent to monopolize, and a combination, trust and conspiracy to monopolize, do not set forth any cause of action.

5.—The charging paragraphs, 13 to 22, are too general, uncertain and indefinite; they charge nothing unlawful save by averments of conclusions of law; there is nothing specific enough stated on which to base an injunction; facts are not stated with sufficient fullness; arbitrarily raising, lowering, fixing and maintaining the price, as alleged, is not unlawful or the basis of an injunction; it is not stated by what acts of defendants prices were raised, fixed or maintained; the agreement is not alleged with sufficient fullness; the appointment of a general agency is all that is alleged, and that is not illegal; the specific manner of preventing and discouraging importa-

tions is not alleged; there are no allegations that importations were ever prevented or discouraged; there are no allegations that defendants ever acted, are acting or threatening to act under the alleged agreement; the agreement did not fix prices to consumers; it does not appear that consumers' prices were raised in consequence of the agreement; it does not appear that other graziers were in fact forced out of the market; the "ability" charged in paragraph 17 of the bill, to raise and lower and maintain prices, and oppressive prices, does not appear from the petition to be material; paragraph 18 does not sufficiently show that the acts therein charged were done by the concerted action of the defendants or any of them, or collusively; paragraphs 18, 19, 20 and 21, which charge the acts alleged to be done under the agreement, do not sufficiently show at what time the acts in question were done, or that at the time they were done they were unlawful, or were acts which this court has power to enjoin; an injunction cannot possibly issue in the terms prayed for, or according to the allegations of the bill, even if one can issue at all, as to any of the acts charged; it is uncertain whether it is intended to be alleged in paragraph 10 that the defendants can and do control or can and do if combined, and whether it was intended to be alleged that the defendants are combined; there is no showing that the action is one arising under the Constitution and laws of the United States.

The law under which this case is brought appears to be devoid of vagueness and uncertainty. The first section makes a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or foreign nations" a misdemeanor. The third section makes the same acts done in restraint of trade or commerce in a Territory a misdemeanor. The object of the statute is to prevent combinations in restraint of trade and commerce. The decisions that have been made under the provisions of the statute agree that competition is essential to trade from the point of view of the public in whose interest the statute was enacted, and that a combination to restrain or destroy com-

petition, with ability to do so, is within the statute as a combination in restraint of trade. *Northern Securities Co. v. United States,* 193 U. S. 197, 337-338.

It is charged in the bill that "in order to monopolize and attempt to monopolize and combine and conspire to monopolize trade and commerce in" beef cattle and fresh beef in the Territory, the defendants have, are and intend to continue to be engaged in a certain unlawful combination, trust and conspiracy. The demurrers say that this sets forth no cause of action. It is true that the statute under which this case is brought does not make the attempt to monopolize or the act of monopolizing the trade or commerce in a Territory an offense, but it declares a combination or conspiracy in restraint of trade or commerce in a Territory to be illegal and provides punishment for such conduct. While all restraints of trade are not monopolies, all commercial monopolies are probably restraints of trade. It will be seen that the bill does not charge the defendants with monopolizing or attempting to monopolize the beef trade of the Territory, but of combining and conspiring to do so by controlling prices, etc. If a monopoly is the exclusive control of a trade tending to the exclusion of all others therefrom, it can hardly be contended that a combination to effect a monopoly is not a combination in restraint of trade.

An important ground of demurrer, referred to in the third part of the above summary, is that the bill is uncertain in that it does not state what means have been taken to carry out the alleged unlawful combination, trust and conspiracy, or what, if any acts have been done in pursuance thereof, or whether any acts have been done thereunder, or, if done, are illegal or in violation of the act. It appears from the decisions made under the provisions of this act that it is not necessary to say in a bill for the enforcement of the act that any means have been taken to carry out the objects of the unlawful combination, trust and conspiracy charged. It is sufficient if it is shown that a combination in direct restraint of trade or commerce, with sufficient powers for the accomplishment of such

object, has been entered into. "It is our duty to ascertain whether the proof discloses a combination in direct restraint of interstate commerce; that is to say a combination whereby the power has been acquired to suppress competition between two or more competing and parallel lines of railroad engaged in interstate commerce. If it does disclose such a combination —and we have little hesitation in answering this question in the affirmative—then the anti-trust act, as it has been heretofore interpreted by the court of last resort, has been violated, and the government is entitled to a decree." *United States v. Northern Securities Co., et al.,* 120 Fed. Rep. 721, 731 :affirmed 193 U. S. 197. The dissenting opinion of Mr. Justice Holmes in the *Northern Securities* case, page 409, cited in defendants' briefs, "that there is no combination in restraint of trade until something is done with the intent to exclude strangers to the combination from competing with it in some part of the business which it carries on," is contrary to the opinion of the court as given above. Moreover, the bill before the court alleges contrivances to debar strangers to the combination from competing with it, for instance,—the agreement to try to prevent importations in favor of competitors of the defendants.

In this case, however, the bill alleges that the combination, trust and conspiracy charged was to be effected by means of an agreement between the Metropolitan and the remaining defendants and each of them, whereby the latter agreed not to engage in the retail trade in beef cattle and fresh beef in the Territory as competitors of the Metropolitan, nor produce, deal in or deliver beef cattle and fresh beef to or for any competitor of the Metropolitan, and would prevent and discourage by every possible means and manner within their power all importations of beef cattle and fresh beef into the Territory by anyone else, to or for any competitor in the Territory of the defendants or any of them; and whereby the Metropolitan agreed with the remaining defendants and each of them to purchase its entire demands for beef cattle and fresh beef from them at an agreed price, which should be the same to each of

them, and to apportion the quantities so purchased among them, and that it would not produce, deal in, puchase or import into the Territory any beef cattle and fresh beef other than such beef cattle and fresh beef as it purchased or should purchase from them, and would prevent and discourage by every possible means and manner in its power, all importations into the Territory of beef cattle and fresh beef by anyone else other than the remaining defendants or any of them, and that it was further agreed that the price so fixed to be paid to each of the remaining defendants should not be changed in any manner by the demand for fresh beef in the localities supplied by the Metropolitan, nor by the supply of beef cattle available for such localities, save by the consent of the remaining defendants.

Here is an agreement to do definite things and to refrain from doing definite things in order to effectuate the alleged combination. In the words of the decision in *Swift & Co. v. United States,* 196 U. S. 375, 400, "The charge is not of a single agreement but of a course of conduct intended to be continued. Under the act it is the duty of the court, when applied to, to stop the conduct. The thing done and intended to be done is perfectly definite: with the purpose mentioned, directing the defendants' agents and inducing each other to refrain from competition in bids. The defendants cannot be ordered to compete, but they properly can be forbidden to give directions or to make agreements not to compete."

In the case before the court the remaining defendants can not be compelled to engage in the retail trade of beef cattle and fresh beef in the Territory, but they may be enjoined against combining under agreements not to engage in such trade as competitors of the Metropolitan, such agreements being obviously in restraint of trade; and so as to the other stipulations of the alleged agreement; the covenants of the remaining defendants to refuse to deal with any and all competitors of the Metropolitan, and to try to prevent importations by others than themselves in favor of any such competitor, look like agreements in

restraint of trade in the Territory; and the stipulations of the Metropolitan to purchase its entire supply from the remaining defendants at an agreed price which should be the same for each of them, and to apportion the quantities purchased among them, and that it would not produce, deal in or import beef cattle and fresh beef other than it purchased or should purchase from the remaining defendants, and would try to prevent importations by anyone other than the remaining defendants in favor of any competitor of the defendants, are obviously for the object of destroying competition among the defendants in the beef trade, and creating a monopoly in the business by preventing competition from rival dealers.   The further agreement that the price so fixed to be paid to each of the remaining defendants by the Metropolitan should not be changed, either by the demand for fresh beef in the localities supplied by the Metropolitan or by the supply of beef cattle available for such localities, save by the consent of the remaining defendants, strengthens the conviction produced by the other stipulations, and adds the new element of a restraint of trade, which is to be effected by the removal of that influence on prices which is usually created by the laws of supply and demand upon a business that is free and unrestrained. *Whitwell v. Continental Tobacco Co.,* 125 Fed. Rep. 454, 459. Even the apparently innocent stipulation to "apportion" becomes an element in the scheme to restrain trade in view of the other stipulations, because it aids in the restraint to be created by the agreement for a uniform price, which is to destroy competition between the other defendants, for the dealer with more or better cattle than the other is thus debarred from making the most of such advantage.   Is not this a rather elaborate showing of means taken to carry out the alleged unlawful combination, and do not such agreements stand as acts performed in pursuance of such combination?   Counsel for defendants contend that no "specific devices" are alleged by which the agreement, probably meaning the combination charged, is to be enforced or carried out, and for want of them there is

nothing to which an injunction can be directed; and then, referring to the *Swift* case, supra, they describe the "specific devices" alleged in that case as follows: "(1) by directing their agents to refrain from bidding against each other; (2) holding secret meetings and there agreeing upon prices; (3) notifying these prices by letters and telegrams; (4) adhering to the prices so fixed; (5) collusively restraining and curtailing quantities of meat shipped whenever necessary to the maintaining of prices so fixed; (6) imposing penalties against each other for deviations from prices; (7) establishing a uniform rule for credits to dealers; (8) notifying each other of the delinquent dealers; (9) keeping a black list; (10) refusing to sell meats to delinquents."

In the present case, the bill alleges in paragraph 13, that in pursuance of the unlawful combination charged, the defendants have and will continue arbitrarily to raise, lower, fix and maintain prices at which they and each of them will sell beef cattle and fresh beef to dealers and consumers. Controlling prices in order to effectuate an unlawful combination to destroy competition among those combining and to create a monopoly is a device to accomplish that result, and may be restrained by injunction. The injunction in the *Swift* case, supra, enjoins, among other things, the "raising or lowering prices or fixing uniform prices at which said meats will be sold," "by combination, conspiracy or contract." In like manner the remaining defendants may be restrained from agreeing not to deal with competitors of the Metropolitan. And the Metropolitan may be restrained from agreeing with the remaining defendants to purchase its entire supply from them at an agreed price which should be the same from each of them, and to apportion the quantities purchased among them, and that it will not produce, deal in or import beef cattle or fresh beef other than it should purchase from them, and will try to prevent importations from others than the remaining defendants in favor of any competitor of the defendants. And all of the defendants may be restrained from agreeing that the

price so fixed, as charged, should be paid to each of the remaining defendants by the Metropolitan and should not be changed either by the demand for fresh beef in the localities supplied by the Metropolitan or by the supply of beef cattle available for such localities, save by the consent of the remaining defendants, and from arbitrarily raising, lowering, fixing and maintaining prices at which they and each of them will sell beef cattle and fresh beef to dealers and consumers; for are not all of these stipulations contrivances or devices for carrying out the unlawful combination charged? What material difference is there between holding secret meetings and there agreeing upon prices and adhering to the price so fixed until changed at a subsequent meeting, as charged in the *Swift* case, and agreeing upon a price at which the Metropolitan should purchase its entire supply from the remaining defendants which should be the same for each of them, and that such price should not be changed, save by the consent of the remaining defendants, either by the supply of or the demand for beef cattle and fresh beef in the localities supplied by the Metropolitan, as in the case before the court? The circumstance that in the one case the bill charges, if it does so charge, which is doubtful, the contrivances mentioned to be in operation, and in the other an agreement is charged through which the contrivances mentioned are to be carried out, makes no difference according to the authority of *United States v. Northern Securities Co.,* above cited. The law makes a "contract, combination in form of trust or otherwise, or conspiracy in restraint of trade or commerce in any Territory" illegal; and it is not necessary to show that such combination or conspiracy is in active operation, but only that it is a combination to suppress competition with the power to do so. Can it be said that the pleadings do not show this? The illegality, for instance, of the acts or conduct agreed on, is not necessarily in the acts themselves but in the circumstance that they are intended to be done by combination, and that they are in restraint of trade. "Unless the agreement involves an absorp-

tion of the entire traffic in lumber, and is entered into for the purpose of obtaining the entire control of it with the object of extortion, it is not objectionable to the statute in my opinion." *United States v. Nelson,* 52 Fed. Rep. 646, 647. Do not the allegations in the present case show a purpose of obtaining the entire control of the Hawaiian beef trade, in Honolulu at least, with the object of controlling prices?

Counsel for defendants make much of the contention that controlling prices and monopolizing as alleged, are not unlawful, that it is uncertain from the bill that any acts have been done that are unlawful and that in regard. to the agreements charged, the appointment of a general agency is all that is alleged and that is not illegal.

It is not necessary that in a case of this kind the acts alleged to have been done to carry out the unlawful combination charged should be in themselves unlawful.

"No conduct has such an absolute. privilege as to justify all possible schemes of which it be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and, if it is a step in a plot, neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law." *Aikens v. Wisconsin,* 195 U. S. 194.

Judge Morrow, in *Loewe v. California State Federation of Labor,* 139 Fed. Rep. 71, 85, says of the ruling of which the above quotation is a part: " This opinion of Mr. Justice Holmes, while it was directed to the construction of a statute, appears to go to the heart of the whole question, and disposes of the argument that there can be no liability of a combination for acts unless the acts themselves are criminal."

The further point is made in the demurrers that "there is no allegation that the graziers agreed with each other  .  .  . nowhere in the bill is there an allegation that any grazier agreed with any other grazier to do anything whatever"; and consequently the agreement alleged cannot support the alle-

gation of law that the defendants have engaged in an unlawful combination.

It will be seen on examination of paragraphs 13, 14 and 15 of the bill that the defendants are charged with being engaged in an unlawful combination to control prices in the fresh beef trade of the Territory in order to destroy competition among themselves and to monopolize such trade, which combination was and was to be effectuated and maintained by the agreement under consideration between the Metropolitan and the remaining defendants. Certain stipulations of this agreement require both the Metropolitan and the remaining defendants to do certain things and not to do certain things. Other stipulations provide for an agreed price at which the Metropolitan should buy beef from the remaining defendants, which was to be the same as to each of them, and that such purchases should be apportioned among the latter. Here is mutuality, not only between the Metropolitan and the remaining defendants, but among the remaining defendants themselves as well. This mutuality continues and is still more conspicuous in the further stipulation that such agreed price shall not be changed save by the consent of the remaining defendants, either by the supply of beef cattle or the demand for fresh beef in the localities supplied by the Metropolitan. Where an agreement intrinsically shows mutuality between parties to it, it is sufficient without an express statement of such mutuality. Moreover the alleged agreement is not charged as the unlawful combination, but as the means adopted for carrying it out.

In the argument on the demurrers it was contended that a reasonable construction of the anti-trust act required that the restraint referred to in the act should be interpreted to mean an unreasonable restraint only. This question, however, is decided adversely to such contention by the Supreme Court of the United States in the case of *United States v. Trans-Missouri Freight Ass'n.*, 166 U. S. 290, 340, which is supported by the cases of *United States v. Joint Traffic Ass'n.*, 171 Id. 505 and *Northern Securities Co. v. United States,*

193 Id. 197. It is true that Mr. Justice Brewer who concurred in the decision in the *Northern Securities* case, dissents on this point, excepting from the application of the statute "those minor contracts in partial restrain of trade which the long course of decisions at common law had affirmed were reasonable and ought to be upheld." The Supreme Court of the Territory of Hawaii lately adopted this conclusion in the case of *Hawaiian Carriage M'f'g. Co. v. Schuman Carriage Co.*, 17 Haw. 495, and while I am not disposed to quarrel with it in its conception of the law, I am inclined to the view that the reason of the apparent exceptions is not that suggested by those who contend that it is their reasonableness, but rather is in the statute itself. This makes every contract, combination, etc., in restraint of trade and commerce among the several States or with foreign nations or in any Territory or the District of Columbia or between Territories and States or the District of Columbia or foreign nations, illegal and punishable. The statute thus makes no exception but includes all contracts and combinations as well as conspiracies "in restraint of trade," and makes them unlawful. The title of the act has little significance, but merely follows the act. These words "in restraint of trade," include, I submit, not only the meaning conveyed by the words *for restraint of trade,* indicating intention or purpose, but also the broader meaning of restraint as the necessary and logical and also the main result of the undertakings mentioned: for if the intention of Congress had been only the meaning given in the first construction, it would have been likely to have used the words combinations, etc., *for restraint of trade* or *to restrain trade.* We have therefore a law that forbids all restraints of trade by combination both where that is the purpose of the contract or combination, and where that is the unavoidable or inevitable and main result of the contract or combination which may be ostensibly for other objects. Under the first proposition, combinations to do something else than restrain trade, but which do restrain trade remotely and incidentally, are clearly

not within the act, not showing an unlawful purpose, while under the second proposition, those combinations which must restrain trade as their inevitable and main result, are within the act, even though ostensibly for other objects, as the fact is that their main result must be restraint of trade; such consequence of the combination would or ought to be known to the parties thereto sufficiently to bring them within the rule of law as to criminal intent, that is, that they intend to do a thing that is a violation of the law, rather than that they intend to violate the law.

" Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth v. Peaslee,* 177 Massachusetts, 267, 272. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Swift & Co. v. United States,* supra, 396.

Some fault is found with the grammatical construction of parts of the bill, particularly of paragraph 10, which alleges that from the circumstance that the defendants comprise nearly all of the wholesale beef cattle and fresh beef dealers in the Territory, they "if combined together, can, and do absolutely control the prices, etc." This is certainly a defective and uncertain statement, and the defendants complain that it is difficult of comprehension. This point, however, is covered by paragraph 13, where it is definitely alleged that in pursuance of the combination charged, the defendants "have arbitrarily raised, lowered, fixed and maintained, and will continue to arbitrarily raise, lower, fix and maintain prices." An allegation in paragraph 17 on the same point is similarly criticised; this also is cured by the definite statement of paragraph 13 above quoted.

The point is made in the briefs that there "is no agreement not to sell direct to consumers in competition with each other." If this refers to all of the defendants, it is entirely inaccurate; if it refers to the remaining defendants, it appears to be nominally correct.   In the latter case, such agreement as to the Honolulu business, does not appear vital to the case in view of their agreement with the Metropolitan that it should buy all its beef from them at an agreed price, which only they might change, and should apportion the cattle purchased among them, and that they would not sell to any rival of the Metropolitan, for would not their dealing in competition with other, with independent dealers in Honolulu, be dealing with rivals of the Metropolitan?   So far as the bill shows, there may thereby be places outside of Honolulu where the Metropolitan is not engaged.   This is implied in paragraphs 5 and 15.   In regard to such places there appears nothing in the bill which would preclude any of the other defendants from supplying the local demand of dealers and consumers, and even competing with each other in so doing.   Such action would seem to be outside of the field of the combination charged except as the power of the defendants engaged in the business in such places, to control prices, might be indirectly and favorably affected by the work of the combination in other places and particularly in Honolulu.

There seems to be no necessity for an agreement that the other defendants shall sell to the Metropolitan all that it shall demand, for starting with an agreed price which only the former can change, the reasons on their part for keeping up the agreement are favorable enough for all practical purposes.

It is contended that the stipulations of the alleged agreement whereby the remaining defendants and each of them agree not to engage in the retail trade in beef cattle or fresh beef as competitors of the Metropolitan, nor produce, deal in, or sell beef cattle or fresh beef to or for any competitor of the Metropolitan, are shown by paragraphs 4, 8, 9, 10, 17 and 21 of the bill to have been violated by their selling to dealers

other than the Metropolitan as alleged. Upon an examination of these paragraphs I find no statements or admissions that the remaining defendants have engaged in such retail trade or that they have been or are dealing with competitors of the Metropolitan. The fact that the bill states that the defendants are and will be engaged in the business of producing and selling beef cattle and fresh beef to dealers and consumers in the Territory does not imply that such production and sales are for or to competitors, for other allegations of the bill, particularly those in paragraph 5, allege that the Metropolitan is and will be engaged in the business of selling, shipping and delivering beef cattle and fresh beef to dealers and consumers in the Territory and particularly in the city of Honolulu for and on behalf of the other defendants, and it is alleged in paragraph 13 that defendants will sell directly or through their respective agents to dealers and consumers, thus conclusively showing that a part at least of the business of the other defendants above referred to of furnishing beef cattle and fresh beef to the dealers and consumers of the Territory, is and will be done through the Metropolitan. Paragraph 5 of the bill further contains the following significant sentence: referring to the business of the Metropolitan in dealing with dealers and consumers for and on behalf of the other defendants, it adds, "and in so far as the city of Honolulu is concerned, exclusively on behalf of said defendants." If this means that the Metropolitan handles the whole supply from the remaining defendants for Honolulu, it would imply that it does not necessarily, under the agreement, handle the whole supply of the remaining defendants for places outside of Honolulu, leaving them free in such places to do a wholesale business with dealers who are not competing with the Metropolitan. The sentence under consideration is open also to the construction that the Metropolitan, so far as Honolulu is concerned, deals with no other parties than the remaining defendants. To my mind the first construction is the more strongly favored by the context. It may be that the sentence was intended to cover both meanings.

The demurrers state as a ground of demurrer to paragraphs 14 and 15 of the bill, that they charge merely the establishment of a general agency—the Metropolitan, which was to buy from them and to which they were to sell, which was not illegal. When we study this so-called "general agency" in the light of references to it in other parts of the bill, we find that the stipulations establishing the relations between the Metropolitan and the other defendants require among other things that the former shall buy its entire supply from the latter at an agreed price to be paid to each of them and shall apportion the quantities purchased among them, which price shall not be changed either by the supply or demand for beef in the localities supplied by the Metropolitan, save by the consent of the remaining defendants. These provisions are illegal in that their effect is to destroy all competition between the remaining defendants in the business of furnishing beef to the Honolulu market. This is done by fixing a uniform price which is not to be affected by the supply or demand of the commodity in question; for it is obvious that such an arrangement among dealers who control about ninety per cent. of the beef cattle of the Territory must, under the circumstances, tend to raise the retail prices of fresh beef in the city of Honolulu; at any rate it places in the Metropolitan, more than seventy-five per cent. of whose capital stock is alleged to be owned by the remaining defendants and who elect and control its officers and directors, the power to raise such prices. The other stipulations of the agreement, which are fully referred to above, reinforce and strengthen this power.

" The mere existence of such a combination and the power acquired by the holding company as its trustee, constitute a menace to and a restraint upon that freedom of commerce which Congress intended to recognize and protect, and the public is entitled to have protected." *Northern Securities Co. v. United States,* supra, 327.

It is not necessary to show in proceedings under the anti-

trust act that restraint of trade is effected or is made complete by the combination complained of.

"All of the authorities agree that in order to vitiate a contract or combination, it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition." *United States v. E. C. Knight Co.,* 156 U. S. 1, 16; *Addyston Pipe & Steel Co. v. United States,* 175 Id. 211, 237.

It is no objection to the bill, as urged by the defendants, that the alleged agreement does not fix the price at which beef cattle should be sold to the Metropolitan. The agreement provides an arbitrary way for fixing a uniform price independent of the laws of supply and demand, and this is sufficient. *Addyston Pipe & Steel Co. v. United States,* supra, 211, 240-241.

Paragraphs 18, 19, 20 and 21 of the bill are demurred to on the ground that in charging the acts done under the agreement they do not sufficiently show at what times the acts in question were done or that at the time they were done they were unlawful or acts which this court has power to enjoin. The latter part of this objection has been considered. In regard to the first part, paragraph 18 charges a present and continuing withholding from the trade of large quantities of beef cattle for the purpose of creating a scarcity and consequent increase of prices; this conduct is not charged as something agreed to be done, but as conduct followed in pursuance both of the agreement and the combination entered into by the defendants. Paragraph 19 charges the acquirement of a monopoly whereby consumers and dealers are compelled to buy of defendants; and paragraph 20 charges defendants with arbitrarily raising prices charged to dealers and consumers from time to time and a continuation thereof, which is a device for carrying into effect the purpose of the combination as charged. These allegations are probably as specific as the plaintiff was able to make them with the information obtainable, and they appear to

me to be reasonably so.   On this point and in regard to the profuse objections of the demurrers to the bill and to certain paragraphs of it as uncertain, indefinite, insufficient and too general, I desire to quote the following passage from *Swift & Co. v. United States,* 196 U. S. 375, 395 :

" The general objection is urged that the bill does not set forth sufficient definite or specific facts.   This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading.   If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute.   Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place.   The elements, too, are so numerous and shifting, even the constituent parts alleged are and from their nature must be so extensive in time and space, that something of the same impossibility applies to them.   The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties.   On the other hand, we equally are bound by the first principles of justice not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt.   We cannot issue a general injunction against all possible breaches of the law.   We must steer between these opposite difficulties as best we can."

Although the scheme set forth in the bill before the court is less vast than that presented in the *Swift* case, yet the application of the citation seems justifiable from many points of similarity between the two cases.   The following quotation from the same case, page 395, does not appear to be inapplicable in view of some of the objections :

" Whatever may be thought concerning the proper construction of the statute, a bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it

fairly conveys to a dispassionate reader by a fairly exact use of English speech."

The point is urged against the bill that it is bad in not alleging when and how the conspiracy was formed or the acts done under it or the persons who have been injured, and the case of *Rice v. Standard Oil Co.*, 134 Fed. Rep. 464 is cited in support of this contention. This was an action brought under the seventh section of the act, which gives a right of action for damages by any person injured by any other person by reason of anything forbidden or declared unlawful in the act. It is evident that a declaration under such section must "aver not only facts showing such a contract or combination or conspiracy as is declared by the act to be unlawful, but facts showing that by reason of such unlawful thing he has been injured in his business or property." *Id.* 465. This reasoning does not apply to the present case which is a petition for an injunction under section 4 of the act. As to the time when the conspiracy was formed or the alleged acts done under it, the bill charges that the agreement by which the combination charged was to be effected, was entered into after the enactment of the anti-trust act, that it is now in existence and has been for more than the year last past. In a case of this kind, this must be accepted as sufficient. The above citations from the *Swift* case bear on this point. The same may be said as to the times when other alleged acts under the combination were done. It is enough that the prices of the commodity have been, are now and will be controlled by such combination, and that large quantities of beef cattle are and will be withheld from the trade for the purposes mentioned.

Although the combination complained of may have been legal when entered into, it became illegal upon the application of the laws of the United States to the Territory by the organic act, if it and the acts done under it after that time were in violation of the anti-trust act. *United States v. Trans-Missouri Freight Ass'n.*, supra.

As to the contention that the anti-trust act as a penal law

must be construed strictly, "though penal laws are to be construed strictly, yet the intention of the legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the legislature." *United States v. Lacher,* 134 U. S. 624, 628; *Johnson v. Southern Pacific Co.,* 196 Id. 1, 17-18. And as to statutes in derogation of the common law, "they are also to be construed sensibly, and with a view to the object aimed at by the legislature." *Gibson v. Jenny,* 15 Mass. 205.

To the grounds of demurrer that the bill shows no cause for relief and that the court is without jurisdiction, it must be answered that a bill of this character, in which the different parts are connected by references, giving a continuous narrative of facts, conduct and circumstances charged, must be construed as a whole. "It must be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech." *Swift & Co. v. United States,* supra, 395. With the conclusions already reached by the court, these points will not require further consideration.

In regard to the contention that what one may do all may do, it is enough to say that the statute has made certain conduct by several persons combined illegal and punishable, and the fact that the same things done by a single person would be no violation of the law does not figure in the case. *Bobbs-Merrill Co. v. Straus,* 139 Fed. Rep. 155, 191.

Among the many cases cited by the defendants in support of their position, there are some which antedate the anti-trust act under which this case is brought, and there are others which, though decided after the enactment of the anti-trust act, have been brought and tried under other jurisdictions than that of the federal courts, which are not affected by the anti-trust act enacted by Congress. These circumstances tend to lessen if not to destroy the applicability of such decisions to the present case. For instance, in *Mogul Steamship Co. v. McGregor, Gow & Co.,* L. R. App. Cas. (1892), page 25, much relied on by the defendants, the acts complained of as

unlawful by which the defendants in that case sought to control the shipping trade in tea from China, were: 1. The offer to shippers of a benefit by way of rebate if they would not deal with the plaintiffs; 2. The sending of special ships to Hankow in the hope by competition, to deprive the plaintiffs' vessels of profitable freight; 3. The offer at Hankow of freights at so low a rate as to be unprofitable to the rival ship owners; 4. Pressure on their own agents to induce them to ship only on the defendants' vessels. The court held that as the acts of the defendants were done with the lawful object of protecting and extending their own trade and increasing their profits and as they had employed no unlawful means, the plaintiffs had no cause of action. Although this decision may have been correct under English law, the case would, in all probability, have been decided differently if it had been brought under the federal anti-trust act, and contained elements of a combination in restraint of interstate trade, and of monopolizing or of combining to monopolize such trade. Under the American decisions of cases brought under the anti-trust act, the fact that the several acts charged are lawful is no defense. " The plan may make the parts unlawful." *Swift & Co. v. United States,* supra, 375, 396; *Aikens v. Wisconsin,* supra, 194, 206. The decision in the *Swift* case, supra, 402, in referring to the alleged arrangements with the railroads for rebates of freight charges, says, " We are of the opinion, however, that such a combination is within the meaning of the statute. It is obvious that no more powerful instrument of monopoly could be used than an advantage in the cost of transportation." The opinion in the *Freight Association* case, supra, 335, rules out the applicability of the *Mogul Steamship* case to cases brought under the interstate commerce act and the anti-trust act.

The defendants contend that the *Trans-Missouri Freight Association* case holds that to sustain a prosecution even in a jurisdiction in which the second section of the statute in regard to monopolies is applicable, the defendants must be shown to be corporations regulated by law, engaged in the public ser-

vice and forbidden to enter into contracts of the character in suit. I do not so understand the decision in that case. The fact that the defendants were railroad corporations was commented on as showing that in their public character, agreements made between them for controlling rates were peculiarly within the purpose of Congress in enacting the statute. There is nothing in the decision limiting the application of the act to such or similar corporations.

If the contention that an intent unlawfully to interfere with the rights of third parties must be shown to be malicious and be intended to be carried out by violence or fraud, refers to an unlawful intent to restrain trade, I must disagree with the conclusion that such intent must be shown to be malicious and be intended to be carried out by violence or fraud. The anti-trust act and the decisions under it do not support such a proposition. The intent to combine in restraint of trade is an unlawful one and has been fully alleged.

The defendants' briefs are voluminous and able, and I have given them careful study, and have tried to do justice to their contentions and authorities under the demurrers so far as the time at my disposal has allowed. I have neglected to deal with some minor points not deeming their consideration necessary to the disposition of the case. But reading the statute and the decisions of cases brought under it, I cannot avoid the conclusion that the bill discloses a combination in violation of the statute, under both points of the construction given above, which are, intent to restrain trade in a prime necessity of life with power to do so, and a scheme whose inevitable and main result is to restrain such trade.

Congress, under the menace of a widespread tendency to combine great business interests for the object of removing competition and thereby controlling prices, enacted the anti-trust act and the succeeding acts increasing its efficiency, to check and prevent such operations and to protect both the consumer and the independent dealer and producer from their injurious and arbitrary influences. It intended to make the

act positive and sweeping in order effectively to put an end to the evil against which the statute was enacted.

The demurrers are overruled and the demurring defendants are allowed twenty days in which to answer.